**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARL WOODARD, | ) | CASE NO. 5:22-CV-01728-JG |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | JAMES S. GWIN |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY ADMINISTRATION, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Mr. Carl Woodard ("Mr. Woodard") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge James S. Gwin has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

Mr. Woodard was previously found not disabled in a final and binding decision issued on January 17, 2020. (Tr. 162-86).[1] On January 26, 2021, Mr. Woodard filed new applications for DIB and SSI, alleging a disability onset date of January 15, 2020. (Tr. 325-27). These claims were

---

[1] The administrative transcript ("Tr") is located at ECF Doc. 4 on CM/ECF.

denied initially and upon reconsideration. (Tr. 236-45, 248-55). Mr. Woodard requested a hearing before an ALJ on October 15, 2021. (Tr. 256-57). On March 4, 2022, an ALJ held a telephonic hearing due to the COVID-19 pandemic during which Mr. Woodard, represented by counsel, and a vocational expert ("VE") testified. (Tr. 131-61).

On July 26, 2022, the ALJ issued a written decision finding that Mr. Woodard was not disabled. (Tr. 11-33). The ALJ's decision became final on July 26, 2022, when the Appeals Council declined further review. (Tr. 322-24). Mr. Woodard filed a Complaint on September 27, 2022. (ECF Doc. 1). He asserts the following assignment of error:

(1) Whether the Administrative Law Judge's decision is supported by substantial evidence when he did not properly evaluate the opinion of Plaintiff's treating nurse.

(ECF Doc. 7, PageID#1210).

### III.    BACKGROUND INFORMATION[2]

#### A.    Personal, Educational, and Vocational Experience

Mr. Woodard was born in 1979, and he was 40 years on the alleged disability onset date. (Tr. 25). He is not married and lives alone. (Tr. 138). At the time of the hearing, Mr. Woodard had a driver's license. (*Id.*). He is a high school graduate. (Tr. 139). He served in the U.S. Marine Corps for approximately four years (*id.*) from 1997 to 2001 and worked as a journeyman lineman about 11 years (Tr. 140). At the time of the hearing, Mr. Woodward was unemployed. (Tr. 139).

#### B.    Relevant Hearing Testimony

##### 1.    *Mr. Woodard's Testimony*

Mr. Woodard's last job ended due to his mental impairments and alleged racial discrimination in the workplace. (*See* Tr. 142-43). After his final job, his chronic knee pain "started

---

[2] Because Mr. Woodard's assignment of error focuses solely on the evaluation of a medical opinion based solely upon his left knee impairment, the summary of the record is limited to portions related to that impairment.

to become a little bit less tolerable… [and he] went to the VA and got the X-rays and MRIs and then [the VA] gave [him] the diagnosis and that's when [he] started getting treatment and using equipment" such as the knee brace "and things like that." (Tr. 142-43). He testified that his left knee pain has worsened. (Tr. 145). In addition to physical therapy, Mr. Woodard testified that he treats his knee pain by keeping his knee elevated as much as possible and applying ice or heat. (*Id*). He stated that his knee pain is ongoing pain and he "just deal[s] with" it. (*Id.*). He further testified that occasionally he experiences swelling in his knee, and that the knee is "warm to the touch." (*Id.*).

Mr. Woodard testified that, at the time of the hearing, he could only walk approximately 100 feet before having to sit down and take a break. (Tr. 147). He described his walking pace as "normal." (*Id.*). He further testified that, in the past, he used a cane or walking stick, but his physical therapist recommended that Mr. Woodard "come out of the [knee] brace" and try not to use a walking stick because it weakens rather than strengthens his knee. (*Id.*). He also testified that his standing is limited due to his left knee. (*Id.*). He was unable to provide an estimate of how long he can stand in one place without a device or a cane before he had to take a break. (Tr. 148).

Mr. Woodard also testified that he experiences issues with his balance. (*Id.*). Specifically, he stated that he has fallen "[a] couple of times." (*Id.*). On some occasions, the falls happened because he "tried to put a little bit too much weight" while going up the stairs and his knee "just gave out on [him]." (*Id.*). On other occasions, the falls happened while he was descending the stairs and when "[he] put weight on [his] left knee, if [he] just step[ped] the wrong way." (*See id.*). Because of these falls, he has to grab onto the guardrail and exercise caution when going down stairs. (*See id.*). He further testified that he was advised he would eventually need to undergo a

knee replacement, but that his physicians decided to delay the procedure until he turned 50 years old. (Tr. 151).

### 2.  *Vocational Expert's Testimony*

The vocational expert ("VE") testified that Mr. Woodard's past relevant work was as a line repairer. (Tr. 156). As a hypothetical question, the ALJ asked the VE whether an individual with Mr. Woodard's age, education, and work history that could perform a full range of light work with the exception, in relevant part, the limitations of occasionally climbing ramps and stairs, but no ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; only frequent exposure to loud noise such as heavy traffic, vibration, hazardous moving machinery, or unprotected heights could perform Mr. Woodard's past relevant work. (*Id.*). The VE opined that this individual could not perform Mr. Woodard's part relevant work as a line repairer but could perform other jobs as an inspector/hand packager, mail clerk, and routing clerk. (Tr. 157). The VE further opined that employers tolerate eight to ten absences per year for unskilled occupations. (Tr. 158). The VE testified that if an individual was absent approximately four days a month, this would exceed employer tolerance levels. (*Id.*).

The VE additionally opined that if an individual had to elevate their leg on the job, it would be work preclusive because it would contribute to time off task behavior. (*Id.*). The VE did opine, however, that how high an individual required their leg to be elevated may impact whether such a limitation is work preclusive. (*See id.*). For example, if the hypothetical individual would have to elevate their leg at heart level (*i.e.*, propping one's leg on an office chair or on some pillows the chair's height or higher), the VE opined that this would be "pretty typical of office environments or work that's performed at a desk or a workstation[.]" (*Id.*). Anything higher than this elevation level would be work preclusive. (Tr. 158-59). The VE opined that the tolerance for time off task

is 10% of the workday or less. (Tr. 159). Finally, when asked whether a sit/stand option at will because of knee pain would reduce the hypothetical individual to a sedentary RFC, the VE opined that it would reduce the number of jobs in the national economy, but that the individual would be permitted to alternate postures throughout the workday. (Tr. 159).

### C. **Relevant Non-Medical/Medical Opinion Evidence**

#### 1. *Mr. Woodard's Adult Function Report*

In April 2021, Mr. Woodard completed an Adult Function Report. (Tr. 368-75). He reported issues with severe knee pain and swelling. (Tr. 368). He stated he cannot stand/walk, squat, or crouch for long periods of time. (*Id.*). He stated that when he sits, he needs to prop up his leg to help with his knee pain symptoms. (*Id.*). He indicated he was using a cane and knee brace. (*Id.*). He also stated that nightmares and pain disrupt his sleep. (Tr. 369). He further stated that his normal activities vary by day based on his pain levels and mood. (*Id.*). He wakes up, washes himself, eats something, and does stretching/home exercises. (*Id.*). He reported preparing simple meals (*e.g.*, sandwiches and frozen dinners) almost daily. (Tr. 370). He reported he was no longer able to do yardwork and could perform other chores only for short periods of time due to pain. (*Id.*). He reported that his pain sometimes interfered with his focus while watching television. (Tr. 372).

#### 2. *State Agency Physical Consultant Opinions*

At the initial level of consideration, Dr. Gary Hinzman, M.D. (a state agency consultant) found that Mr. Woodard could perform light work involving no climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to noise, vibration and hazards (*i.e.*, machinery, heights, etc.). (Tr. 186-205). In addressing the opinion of Ms. Sonya Wells, NCP (Mr. Woodard's treating

5

provider), Dr. Hinzman found that Ms. Wells did not provide objective opinions to support her opined restrictions, that the opinion contrasted with other evidence in the record, and that the opinion was "without substantial support from the medical source who made it[.]" (Tr. 191-92, 201-02).

At the reconsideration level, Dr. Rannie Amirir, M.D. (another state agency consultant) considered the evidence through April 2021 and August 2021, including the treatment notes and opinions from Ms. Wells, and concluded that the evidence did not show changed circumstances warranting deviation from the light RFC found in the prior, final January 2020 decision. (Tr. 208-28). Dr. Amirir also addressed Ms. Wells' opinion and similarly found that Ms. Wells did not support her opinion with objective findings, that the opinion contrasted with over evidence in record, and that it was without substantial support from the record. (Tr. 214, 225).

### 3. *Sonya Wells, NCP*

On February 25, 2021, Ms. Wells completed a Residual Functional Capacity Report. (Tr. 478-80). The form she completed included check boxes, answers to be circled, and some blank fields. (*See generally id.*). Ms. Wells noted that she had been treating Mr. Woodard for six months; he had an appointment with her every three months. (Tr. 478). Ms. Wells  identified Mr. Woodard's diagnosis as a left knee injury, prognosis as poor, and symptoms as left knee pain, edema, and insomnia due to the pain. (*Id.*). Ms. Wells opined that Mr. Woodard had several work-related limitations, including being able to frequently lift 20 pounds; sit and stand/walk for less than two hours during an eight-hour workday; never twist, crouch/squat, climb ladders, or crawl; rarely stoop, kneel, or push/pull; occasionally balance; and frequently climb stairs, reach, handle, feel, hear, and speak. (Tr. 479-80). Ms. Wells further opined that Mr. Woodard had limitations with reaching, handling, and fingering. (Tr. 479). Ms. Wells also stated that Mr. Woodard needed

to shift positions at will from sitting, standing, and walking; sometimes take unscheduled breaks during an eight-hour day; elevate his legs at will 50 percent of the time during prolonged sitting; use a cane or other assistive device while engaging in occasional standing/walking; and be absent from work about four days per month. (Tr. 479-80).

### D. Relevant Medical Evidence

Mr. Woodard has a history of left knee pain, for which he received physical therapy and a prescription for medical marijuana prior to January 15, 2020 (the alleged disability onset date). (*See, e.g.*, Tr. 428-40). On August 6, 2018, Mr. Woodard's x-rays showed mild tricompartmental osteoarthritis and moderate joint effusion. (Tr. 776).

On October 2, 2018, Mr. Woodard underwent a functional capacity evaluation. (Tr. 428). Based on clinical findings, the assessor determined that Mr. Woodard's reports of pain and disability were unreliable. (*Id.*). The assessor indicated that Mr. Woodard demonstrated functional capacities limited to the sedentary exertional level. (*Id.*). However, the assessor also noted that Mr. Woodard demonstrated "a very high level of apprehension and self-limitation throughout testing," and this behavior "impeded [the assessor's] ability to adequately assess and convey Mr. Woodard's full functional capacities." (*Id.*). Mr. Woodard's active mobility throughout his left lower extremity was limited "due to guarded and apprehension" with joint movements of his left hip, knee, and ankle. (*Id.*). He demonstrated "severe apprehensive and limited functional and weight bearing tolerances" due to reports of increased left knee pain. (*Id.*). His standing and walking tolerances were limited to a "seldom basis" due to reports of left knee pain. (*Id.*). Mr. Woodard was unwilling to attempt squatting or direct weight bearing on his left knee due to increased symptoms of left knee pain. (*Id.*). He also was unable and unwilling to attempt pushing, pulling, or carrying objects due to pain in his left knee. (*Id.*). His lifting tolerances were limited to 10

7

pounds due to reports of increased left knee pain. (*Id.*). The assessor indicated that Mr. Woodard could never squat, kneel, or crawl, but could occasionally stoop. (*Id.*). The assessor also found that Mr. Woodard could "seldom" stand or walk, but he could frequently sit and reach overhead. (*Id.*).

On October 11, 2018, an MRI revealed a grade I strain of the medial lateral ligament (*i.e.,* the ligament that runs along the insider surfaces of the upper shin to the bottom thigh) and some redundancy of the meniscotibal ligament (*i.e.,* a part of the knee joint's fibrous capsule). (Tr. 776).

On January 13, 2020, Mr. Woodard attended a rehabilitation consultation through the Department of Veterans Affairs. (Tr. 775). He reported a 15-to-20-year history of left knee pain and instability after sustaining an injury during four years of military service (from 1997-2001), and he rated this knee pain as eight out of a scale of ten. (*Id.*). On examination, his left knee presented with tenderness, a loss of approximately 20 degrees of extension due to pain, and "4+/5" knee strength. (Tr. 777). The rehabilitation consultant could not perform special tests due to Mr. Woodard's reports of pain. (Tr. 777-78). The rehabilitation consultant administered a corticosteroid injection, ordered an MRI, and referred Mr. Woodard for a replacement knee brace. (Tr. 779). On January 29, 2020, Mr. Woodard was measured for a knee brace (Tr. 625), and this knee brace was fitted three weeks later (Tr. 621-22).

On August 20, 2020, Mr. Woodard met with Ms. Sonya Wells, APRN. (Tr. 641-44). Tenderness and edema were present during a physical examination, but not deformity. (Tr. 644). Ms. Wells referred Mr. Woodard for pain management and advised him to follow up in three months after the pain management appointment. (Tr. 642). On October 12, 2020, Mr. Woodard contacted Ms. Wells' office requesting a note "stating that because of his health conditions, he is not able to work." (Tr. 641). The office informed Mr. Wells that they could not write this requested note. (*Id.*).

On November 5, 2020, Dr. Theodore Le, M.D., conducted an orthopedic evaluation of Mr. Woodard. (Tr. 459). Dr. Le noted that Mr. Woodard solely used medical marijuana for pain control. (*Id.*). At this evaluation, Mr. Woodard presented with a knee brace and was using a walking stick to help with his pain. (*Id.*). Mr. Woodard received an injection and reported that it was helping until recently. (*Id.*). He was positive for osteoarthritis. (*Id.*). The physical exam revealed atrophy of Mr. Woodard's left quadriceps as compared to the right quadriceps, with slight comparable weakness and minimal effusion. (Tr. 459-60). His X-rays showed a decreased joint space consistent with mild to moderate tricompartmental arthrosis in the left knee. (Tr. 475). Because Mr. Woodard had "good relief" from his January 2020 corticosteroid injection, Mr. Woodard received a Kenalog injection in his knee, and Dr. Le recommended additional injections semi-annually. (Tr. 460). Dr. Le also referred Mr. Woodard for physical therapy. (*Id.*). Mr. Woodard attended 16 physical therapy sessions from November 12, 2020, through July 30, 2021. (Tr. 973-1028, 1081-96).

On January 26, 2021, Mr. Woodard reported that he would like a new order for an MRI of his left knee because his pain was getting worse. (Tr. 639). Mr. Woodard's insurance would not approve an MRI unless he underwent physical therapy. (*Id.*). His November x-ray revealed no acute fracture or malalignment; joint space loss of the tibiofemoral compartments as well as subchondral cystic changes, particularly of the lateral tibial plateau and tibial; mild compartmental hypertrophic changes; no joint effusion; and no focal soft tissue swelling. (*Id.*).

On January 27, 2021, Mr. Woodard reported that his knee had not improved after the injection and again requested an MRI. (Tr. 938). On February 4, 2021, Mr. Woodard described persistent knee pain and an MRI was recommended. (Tr. 471). Based on November 2020 x-rays, Mr. Woodard was found to have mild osteoarthritis. (*Id.*). On physical exam, Mr. Woodard had no

9

effusion; could not fully extend his left knee; was tender over the iliotibial band; and was mildly tender over the medial joint line. (*Id.*). Mr. Woodard's remaining findings were normal. (*Id.*). The MRI showed radial tears of the posterior horns of the medial and lateral menisci; tricompartmental cartilage loss, greatest within the medial compartment with focal full-thickness defect and associated delamination; and moderate joint effusion with numerous loose bodies. (Tr. 936).

On February 25, 2021, Mr. Woodard attended a three-month follow up appointment with Ms. Wells for his PTSD and left knee injury. (Tr. 637-38). He reported that his pain is chronic and "never goes away." (Tr. 637). He completed his physical therapy and received a knee injection in November 2020. (*Id.*). Tenderness, deformity, and edema were present during a physical examination. (Tr. 638). Ms. Wells advised Mr. Woodard to continue with physical therapy, ice, heat his left knee as appropriate, and take ibuprofen as needed. (Tr. 637). Ms. Wells completed Mr. Woodard's disability paperwork and sent the paperwork to his attorney. (Tr. 638).

On March 18, 2021, Dr. Le examined Mr. Woodard. (Tr. 935-36). Mr. Woodard reported that he still had pain and had been participating in physical therapy. (Tr. 936). On physical exam, Mr. Woodard had no effusion; could not fully extend his left knee; was tender over the iliotibial band; and was mildly tender over the medial joint line. (*Id.*). He demonstrated good strength and had a stable ligamentous exam. (*Id.*). Dr. Le discussed the possibility of having Mr. Woodard evaluated for a knee arthroscopy given his age. (*Id.*). If there was no improvement, Dr. Le noted that Mr. Woodard would consider a knee replacement. (*Id.*). Mr. Woodard's MRI results revealed radial tears of the posterior horns of the medial and lateral menisci; tricompartmental cartilage loss, greatest within the medial compartment with focal full-thickness defect and associated delamination; and moderate joint effusion containing numerous loose bodies. (*Id.*).

10

On April 16, 2021, Dr. Barton Branam, M.D., examined Mr. Woodard upon referral from Dr. Le. (Tr. 957). Dr. Branam observed that Mr. Woodard had a fairly sizable effusion, marked pain along the joint lines, range of motion to 120/150 degrees, stable cruciate and collateral ligaments, and "fairly global" pain. (*Id.*). Dr. Branam also found that Mr. Woodard was neurovascularly intact. (*Id.*). Dr. Branam recommended a left knee arthroscopy, partial medial and lateral meniscectomies, chondroplasty, and removal of loose bodies. (*Id.*). On May 27, 2021, Mr. Woodard received a handicapped parking placard for May 2021 to May 2026 due to a tear in the lateral meniscus of his left knee and chondromalacia. (Tr. 1032-33).

On June 15, 2021, Mr. Woodard reported a new knee brace. (Tr. 1051). On examination, Mr. Woodard presented with a walking stick and left knee brace, and limited range of motion in his left knee. (Tr. 1054). However, he also presented with normal gait, no joint swelling, normal movement of his upper and lower extremities, and 5/5 strength in his upper and lower extremities. (*Id.*). At another appointment the same day, a mental health provider noted that Mr. Woodard walked with a limping gait. (Tr. 1063).

## IV. THE ALJ'S DECISION

In his June 2022 decision, the ALJ determined that Mr. Woodard had not engaged in substantial gainful activity since January 15, 2020. (Tr. 17). He further determined that Mr. Woodard had the following severe impairments: arthritis of the left knee, degenerative joint disease of the right knee; hearing loss; obesity; adjustment disorder with mixed anxious and depressive features; persistent depressive disorder/major depressive disorder; anxiety disorder; and post-traumatic stress disorder. (*Id.*). However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18-20).

The ALJ also determined that Mr. Woodard could perform light work with the following limitations:

> occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, crawl. [H]e can have frequent exposure to loud noise (heavy traffic); vibration, hazardous moving machinery or unprotected heights; able to perform routine work, able to have superficial (no team/tandem work) interaction with supervisors, coworkers or the general public; able to work in a work environment with occasional changes.

(Tr. 20).

The ALJ next determined that Mr. Woodard could not perform any past relevant work. (Tr. 25). He found that Mr. Woodard had at least a high school education, and that he was a younger individual (age 18-49). (*Id.*). At Step Five, relying on the vocational expert's testimony, the ALJ found that there were other jobs that existed in significant numbers in the national economy that Mr. Woodard could perform. (Tr. 25-27). Accordingly, the ALJ determined that Mr. Woodard was not disabled. (Tr. 27).

## V.     LAW AND ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments,

meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. <u>Analysis</u>

Mr. Woodard argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not properly evaluate the opinion of Ms. Wells, Mr. Woodard's treating nurse. (ECF Doc. 7, PageID#1222-27). Mr. Woodard raises three sub-arguments: (1) that Ms. Wells' opinion was consistent with her own patient notes and the diagnostic studies and notes of other providers; (2) that Ms. Wells' opinion was not a check box form; and (3) that Ms. Wells' opinion was not vague in vocational terms. (*Id.*). For the following reasons, I find that Ms. Woodard's arguments lack merit because substantial evidence supports the ALJ's reasons for finding Ms. Wells' opinion only partially persuasive.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he

considered the supportability and consistency of a source's medical opinion in relation to the objective medical evidence. 20 C.F.R. § 404.1520c(b)(2). According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

The ALJ may consider at his discretion additional factors such as the medical source's specialization and relationship with the claimant. 20 C.F.R. § 404.1520c(c)(3)-(5). If the ALJ determines that two medical opinions are equally supported by and consistent with the medical record but are not exactly the same, then the ALJ must consider the additional factors. 20 C.F.R. § 404.1520c(b)(3).

Here, at Step Four, the ALJ concluded that Mr. Woodard's RFC would allow him to perform light work except that he can occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; and can have frequent exposure to loud noise, vibration, hazardous moving machinery, or unprotected heights. (Tr. 20). In explaining how he reached that conclusion, the ALJ evaluated the persuasiveness of each of the medical opinions contained in the record. (Tr. 23-25). With respect to the state agency physical consultants, the ALJ found their opinions to be mostly persuasive. (*See* Tr. 23-24). The ALJ found Ms. Wells' opinion regarding Mr. Woodard's limitations only partially persuasive because the opinion: (1) was a check box form that did "not provide much rationale as to how th[e] opinion was formulated"; (2) was vague and not in vocational terms; and (3) was not entirely consistent with the objective evidence of the record. (Tr. 24).

15

Mr. Woodard challenges the ALJ's finding regarding the consistency and supportability of Ms. Wells' opinion, arguing that Ms. Wells' treatment notes and the diagnostic assessments and notes of other providers were consistent with Ms. Wells' opinion. (ECF Doc. 7, PageID#1225-27). In response, the Commissioner maintains that the ALJ correctly observed that Ms. Wells' opinion was extreme and inconsistent with the objective evidence. (ECF Doc. 8, PageID#1242).

 Reading the ALJ's decision as a whole, I find that the ALJ did address evidence demonstrating that Ms. Wells' opinion was inconsistent with the objective evidence. *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-59 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense."); (Tr. 22-24). For example, the ALJ noted that on November 5, 2020, Mr. Woodard was noted to have a prior left knee injury while in the military without surgical intervention; was using a brace and walking stick at the time to help with his pain; was only using medical marijuana to treat his pain; and his imaging confirmed left knee osteoarthritis. (Tr. 22; *see* Tr. 459-60). The ALJ also discussed that Mr. Woodard suffered a medial left meniscus tear in early 2020. (Tr. 22; *see* Tr. 935, 945). Providers discussed a left knee arthroscopy, partial medial and lateral meniscectomies, chondroplasty, and removal of loose bodies in March 2021, but the ALJ noted that the evidence did not demonstrate that Mr. Woodard underwent this procedure. (Tr. 22; *see* Tr. 957). The ALJ also observed that on June 14, 2021, Mr. Woodard was wearing a knee brace with a limited range of motion in his bilateral knees but ambulated with a normal gait and 5/5 strength in his bilateral upper and lower extremities. (Tr. 22; *see* Tr. 1054). Given the evidence presented, Ms. Wells' opinion is inconsistent with the objective record evidence.

Further, there is substantial evidence to support the ALJ's decision regarding Mr. Woodard's limitations. For example, the ALJ considered the opinions of the state agency consultants, who found limitations contrary to Ms. Wells' opinion, and deemed those opinions

persuasive. (Tr. 23-24). "State agency opinions may constitute substantial evidence supporting an ALJ's decision." *Hefflin ex rel. LDS v. Kijakazi*, No. 1:20-cv-01414, 2021 WL 4477785, at *6 (N.D. Ohio Sept. 30, 2021) (collecting cases). Specifically, Dr. Hinzman found that Mr. Woodard could perform light work involving no climbing ladders, ropes, or scaffold; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to noise, vibration, and hazards (machinery, heights, etc.). (Tr. 186-205). Dr. Amirir reached the same findings. (Tr. 208-28). They both discounted Ms. Wells' opinion on the grounds that Ms. Wells did not identify objective support for her limitations; the opinion contrasted with other evidence in record; and the opinion was without substantial support from the record. (Tr. 192, 202, 214, 225).

The ALJ deemed these opinions to be mostly persuasive because they were generally consistent with the evidence available at the time and with Mr. Woodard's routine treatment. (Tr. 23-24). The ALJ acknowledged that the state agency consultants did not have the complete file at the time of rending their opinion, but determined that the additional medical evidence received for review at the administrative hearing level confirmed the opinion of the state agency consultants is consistent and mostly accurate. (Tr. 24). Thus, the ALJ concluded that his physical RFC determination was well-supported by the objective evidence of record and adequately accommodated any functional limitations Mr. Woodard might experience as a result of his physical impairments. (*Id.*).

Mr. Woodard offers treatment notes and diagnostic assessment that, in his opinion, would bolster and provide support for Ms. Wells' opinion regarding some degree of limitation from knee pain. But the ALJ articulated substantial evidence that could lead to a different conclusion. (Tr. 22-24). Specifically, for example, the ALJ discussed evidence demonstrating that although Mr.

17

Woodard had limited range of motion in his bilateral knees and was wearing a knee brace, he was ambulating with a normal gait and 5/5 strength in the bilateral upper and lower extremities on June 14, 2021. (Tr. 22; *see* Tr. 1054). And the ALJ deemed the state agency opinions, reaching contrary conclusions from Ms. Wells' opinion, persuasive. (Tr. 24). Based on this evidence, I cannot infer that the ALJ's decision was unreasonable. "[W]hen a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 960 (N.D. Ohio June 24, 2003) (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

Even if the ALJ erred in articulating the persuasiveness of Ms. Wells' opinion, that determination is ultimately immaterial because the ALJ correctly concluded that Ms. Wells' opinion was a check box form. As a general matter, an ALJ may properly afford little weight to a medical source's check box form of functional limitations when it does not cite clinical test results, observations, or other objective findings. *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (collecting cases). In the instant case, Ms. Wells checked boxes and circled answers regarding Mr. Woodard's limitations. (*See generally* Tr. 478-79). Ms. Wells' explanation was minimal; she merely wrote that Mr. Woodard had diagnoses of knee injury and left knee pain; poor prognosis; and symptoms of left knee pain, edema, and insomnia due to his knee pain. (Tr. 478). With respect to frequency and length of contact, Ms. Wells indicated that, at the time of the opinion, she had been seeing Mr. Woodard for six months with an appointment every 3 months. (*Id.*). Ms. Wells' statements offer little, if any, explanation for the extent of her opined limitations for Mr. Woodard.

Although Mr. Woodard argues that these statements constitute adequate explanation, courts in the Northern District of Ohio have concluded that forms with similar explanations

18

constitute check box forms. *See, e.g.*, *Kreilach v. Comm'r of Soc. Sec.*, 621 F.Supp.3d 836, 848 (N.D. Ohio Aug. 15, 2022) (finding that medical source's questionnaires were check box forms where the medical sources "checked boxes and wrote cursory statements about the supporting clinical findings and [p]laintiff's prognosis"); *Duke v. Comm'r of Soc. Sec.*, No. 21 CV 39, 2022 WL 1075171, at *4 (N.D. Ohio Apr. 11, 2022) (finding that medical source's form was a check box form where the form included check boxes and listed claimant's asthma and POTS diagnoses; described treatment as "medications; listed symptoms; and stated that the medical findings were a "fast heart rate and low blood pressure"). Moreover, Mr. Woodard relies on treatment notes that are wholly absent from Ms. Well's opinion. (*See generally* Tr. 478-79).

While a closer call, I also find that the ALJ did not err when he determined that Ms. Wells' opined limitations were vague and/or not defined in vocationally relevant terms. Opinions that express functional limitations in vague terms can be discounted as not describing any functional limitations at all. *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018). Although Mr. Woodard points to some specific limitations (ECF Doc. 7, PageID#1227), specificity regarding other limitations are materially absent.  For example, Ms. Wells opined Mr. Woodard "sometimes" needed to take unscheduled breaks but failed to define the frequency or duration of those breaks; indicated that Mr. Woodard required "a cane or other assistive device" for occasional standing/walking but did not define *what* assistive device was required; and opined that Mr. Woodard could stand for only two hours in an eight-hour workday but failed to define Mr. Woodard's maximum ability to perform each task in that range. (Tr. 478). Thus, the ALJ correctly concluded that Ms. Wells' opinion was only partially persuasive due to vagueness.

Finally, Mr. Woodard states that applying the opinion evaluation factor, Ms. Wells is a treatment provider and that she is "familiar with all of [Mr. Woodard's] orthopedic issues and

resulting symptoms." (ECF Doc. 7, PageID#1225). It appears he is arguing that the ALJ erred by not discussing this factor or deferring to Ms. Wells' opinion on that basis. (*See id.*). But an ALJ is only required to consider the additional factors where the ALJ determines that a medical opinion is equally supported by and consistent with the record as another conflicting medical opinion. 20 C.F.R. §§ 404.1520c, 416.920c; *see also Kreilach*, 621 F.Supp.3d 836, 848 (N.D. Ohio Aug. 15, 2022); *Hicks v. Kijakazi*, No. 22-122-DLB, 2023 WL 4112093, at *4 (E.D. Ky. June 21, 2023). Because the ALJ determined that Ms. Wells' opinion was not entirely consistent with or supported by the record, and was therefore partially persuasive, the ALJ was not required to consider the additional factors.

Moreover, the ALJ evaluated Ms. Wells' opinion using the two required factors, supportability and consistency, and found that both factors weighed in favor of discounting portions of Ms. Wells' opinion. (Tr. 22); *see* 20 C.F.R. § 404.1520c ("[T]he most important factors we consider when we evaluate the persuasiveness of medical opinions or prior administrative medical findings are supportability…and consistency…"). "The fact that one less important factor weighed in favor of [the medical source's] opinion does not change the outcome." *Houser v. Comm'r of Soc. Sec.*, No. 5:21-CV-00369-CEH, 2022 WL 1803049, at *9 (N.D. Ohio June 2, 2022).

In sum, I conclude that the ALJ determined that Ms. Wells' opinion was not supported by or consistent with the evidence. Substantial evidence supports the ALJ's conclusion that Ms. Wells' opined functional limitations were not consistent with or supported by the record evidence. Further, evidence supports the conclusion that Ms. Wells' opinion was vague and was a check box form. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

20

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Mr. Woodard's

assignment of error and affirm the Commissioner's decision.

Dated: July 27, 2023                                    s/ *Jennifer Dowdell Armstrong*
                                                       Jennifer Dowdell Armstrong
                                                       U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.** Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or

waiver of the right to raise the issue on appeal either to the district judge or in a subsequent

appeal to the United States Court of Appeals, depending on how or whether the party responds

to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).

Objections must be specific and not merely indicate a general objection to the entirety of the

report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).